1                   UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK

2

3  ------------------------------X
                              :

4  UNITED STATES OF AMERICA,   :
                            :  16-CR-553 (BMC)

5           v.           :
                            :  November 15, 2016

6  ALEKSEY TSVETKOV,         :  Brooklyn, New York
                            :

7                Defendant.   :
                            :

8  ------------------------------X

9
         TRANSCRIPT OF CRIMINAL CAUSE FOR BOND HEARING

10       BEFORE THE HONORABLE RAMON E. REYES, JR.
            UNITED STATES MAGISTRATE JUDGE

11

12  APPEARANCES:

13

14  For the Government:     UNITED STATES ATTORNEY
                    BY:  ANDREY SPEKTOR, ESQ.

15                   MATTHEW JACOBS, ESQ.
                   ASSISTANT U.S. ATTORNEY

16

17  For the Defendant:      JOEL COHEN, ESQ.
                   Joel S. Cohen, P.C.

18                   35 Worth Street
                   New York, New York 10013

19

20

21  Court Transcriber:      SHARI RIEMER, CET-805
                   TypeWrite Word Processing Service

22                   211 N. Milton Road
                   Saratoga Springs, New York 12866

23

24

25

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

2

I N D E X

EXHIBITS                                    Marked   Received

GOVERNMENT:

1     Picture of Mr. Tsvetkov                          35

2     Cross                                            35

1  (Proceedings began at 11:29 a.m.)

2          THE CLERK:  Criminal Cause for Bond Hearing, Case

3  No. 16-CR-553, <u>United States v. Aleksey Tsvetkov</u>.

4          Counsel, your name for the record.

5          MR. SPEKTOR:  Andrey Spektor and Matthew Jacobs for

6  the United States.  Good morning, Your Honor.

7          THE COURT:  Good morning.

8          MR. COHEN:  For Mr. Tsvetkov, Joel Cohen.  Good

9  morning, Judge.

10          THE COURT:  Good morning.  You were going to tell

11  me, Mr. Spektor, why Mr. Tsvetkov is a danger to the community

12  and a risk of flight.

13          MR. SPEKTOR:  Yes, Your Honor.  So we've proffered

14  some of the evidence about the organization in our detention

15  letter.  Obviously our focus then was on eight defendants.  We

16  wanted to give some evidence about each one of those

17  defendants so we can focus on Tsvetkov a bit more today.

18          Just briefly about this organization, it is -- we

19  take it to be a very serious and sophisticated transnational

20  organization that has ties to Russia, has ties to Israel where

21  they found one of the victims as we explained.  It is an

22  organization that reports to what's called in Russia Bari Vory

23  v Zacone, which is thieves in law, and these are essentially

24  made men leaving abroad.  So we have -- so we are very

25  concerned about this organization in general of which Tsvetkov

4

1    is a part of.

2            Focusing on Tsvetkov in particular, he is in our

3    view he falls in the small subset of individuals who is not

4    bailable and we don't say that lightly.  We know it's a narrow

5    group.  In this case, for instance, we have agreed on bail

6    packages for a lot of defendants.  Some of the defendants were

7    released over our objection but we didn't appeal those

8    decisions.  This is an individual that we take -- whose

9    dangerousness we take seriously and who we can say from the

10   outset would be appealing and we would ask for a stay if Your

11   Honor is inclined to release him.

12           So what makes him so dangerous?  We have to go back

13   to 2004.  That's his first extortion case, his first

14   racketeering case, and that case involved -- the indictment in

15   that case is virtually identical to this one.  When you look

16   at the predicate acts you're looking at an enterprise that

17   operated in Brighton Beach in the same area that's

18   predominantly Russian born individuals in that organization.

19   They engage in illegal gambling, extortion, loan sharking,

20   drug trafficking virtually identical to this organization that

21   ties to individuals abroad.

22           In that case he was detained.  He wasn't bailed out

23   and when you read his conduct, read about his conduct in that

24   case it is as vicious and as disturbing as you'll see.  Just

25   to give you some examples.  We talked briefly about it in our

5

1  letter but he viciously beat a store employee to impress upon

2  the owner of that store the need to pay protection money.  He

3  came into another store wielding a machete to collect

4  extortion money.  In this case we seized a machete from

5  Gershman, one of the co-defendants, the other person that we

6  feel very strongly about being detained.

7          This one is particularly disturbing.  There was a

8  person that he suspected of cooperating.  So he and another

9  person took a wooden board with nails in it and beat that

10  person and when that person tried to put his hand out and

11  tried to block that beating, the person who was with Tsvetkov

12  showed that he had a gun and said we'd shoot you if you keep

13  doing that.

14          We can go on and on about all of the victims that he

15  extorted in that case.  There was another one that was brought

16  into Tsvetkov's car and there was a wire put around his neck

17  and he was being beaten because he didn't pay his debt.

18  There's also we had information from a source in that case

19  that Tsvetkov was involved in a homicide, that he drove the

20  shooter in his car we believe and there was -- there's a

21  murder that happened.  He wasn't the shooter but he was

22  involved in it.

23          So it is, like I said, that case, and I don't think

24  Mr. Cohen is going to disagree, it is as disturbing and as

25  shocking as we see in this courthouse.

1          Now, he got a huge break at sentencing and we should

2   talk about that.  He got a 78 months sentence which is

3   significant here but it could have been a lot more, and the

4   reason he got only 78 months is that the defendant -- defense

5   counsel said look, he's going to be deported anyway and that's

6   really a bigger punishment than any sentence he's going to

7   get.  What's telling and what's [inaudible] in what Judge

8   Garaufis said at sentencing is this.  I'll read and I'll try

9   to read slowly what Judge Garaufis said.

10          My concern quite frankly --

11          MR. COHEN:  What page?

12          MR. SPEKTOR:  You know what, I pulled it out it was

13   eight files.  So I don't know -- I can give you a copy.

14          MR. COHEN:  I have the transcript.  I just want --

15          MR. SPEKTOR:  I actually don't have the transcript

16   but --

17                    [Pause in proceedings.]

18          MR. SPEKTOR:  Actually I have one for the Court if

19   it's easier to follow.

20          So Judge Garaufis said "My concern, quite frankly,

21   is that on the one hand the defendant has a very supportive

22   family and I understand it."  Judge, as you can see here, he

23   has a very supportive family.  This whole courtroom was filled

24   with family and friends yesterday.  We don't dispute that.

25          "On the other hand, there's a certain sense that I

1   get that the defendant is, what's the word, the defendant

2   doesn't really appreciate the significance of all of this in

3   what he's done, that there's sort of an offhand attitude on

4   the part of the defendant and it doesn't offer well for the

5   defendant's future.  I could send the defendant to jail for

6   the maximum under this or the minimum under this and my

7   concern is that notwithstanding the family's support he just

8   doesn't get it.  When he shrugged earlier I was disappointed

9   because I just basically tried to explain what my concerns are

10  and his offhand body language if you will.  I don't think body

11  language can be reviewed by an Appellate Court but it

12  certainly is something that I can take into consideration,

13  offhanded body language indicated.  You could take it or leave

14  it.  I couldn't care about it.  He's remorseless, doesn't know

15  this is a serious situation."

16          That's really -- Judge, this is our concern in this

17  case, that he just doesn't appreciate the situation. He can't

18  control himself.  Maybe he wants to control himself but he

19  just can't.  He's been violent in the past and he's continued

20  his violence and conduct.

21          So in 2004 he's convicted of racketeering.  He

22  then -- he got 78 month sentence.  He actually ends up as Mr.

23  Cohen said, does a little more time because he's in ICE

24  custody because he desperately doesn't want to get deported to

25  Ukraine.  He somehow gets what we've called asylum.  I guess a

1   more accurate term is an order deferring his removal which

2   is -- it gives you fewer rights than asylum does.  You don't

3   get to travel.  It's something that can be reopened by the

4   Government.  He gets it and the way he gets it is also

5   disturbing.  He has -- he relies on hearsay statements made by

6   the lead defendant in that 2004 case about how dangerous

7   Ukraine is for Jewish people, for practicing Jewish people.

8   And I emphasize Jewish people because another disturbing thing

9   is, and I can give you -- this can be Exhibit 1.

10              If you could hand to the judge that one.

11              This is the photograph of the defendant when he was

12   arrested.

13              THE COURT:  Are we talking about this arrest or the

14   20 --

15              MR. SPEKTOR:  This is this arrest.  We'll talk about

16   this picture again a bit later but as you can see one of the

17   things that's tattooed on his arm is a cross.  This is Exhibit

18   2.  This is his right arm right underneath the shoulder.  This

19   is -- I'm handing you Exhibit 2.

20              This diamond cross, which is -- yes, I'm sorry.

21   There's also a cross that was seized from him during the

22   arrest, a diamond cross.  So we skimmed this A file that we

23   got and it raised some eyebrows for a number of reasons.  One

24   is he says he can't go back to the Ukraine because he's a

25   practicing Jew.  He has a cross tattooed on his arm.  He's

9

1    wearing a cross.  He has a lead defendant making statements on

2    his behalf through -- hearsay statements.  I think this --

3    it's safe to say that this asylum or whatever you want to call

4    it is going to be looked at very carefully at the end of this

5    case.  We are not immigration lawyers.  We don't know what the

6    new policies will be under this new administration but this

7    goes to our risk of flight argument more than dangerousness

8    but as he stands here today he knows there's a very good

9    chance that he's going to be deported because one of the ways

10   with asylum that -- asylum can be canceled is if you obtained

11   it through fraud and there's certainly some indication of

12   fraud in this asylum application.

13             So now this case.  The case against him is strong.

14   It's strong because we have wire tap evidence.  His phone

15   wasn't tapped.  What's unusual about him is that he is

16   intercepted on multiple lines, on at least three lines of

17   individuals who are right in the middle of this syndicate, and

18   what that shows you is that he's not just associated with

19   them.  He's right in the middle.  And I wouldn't be surprised

20   if we're here months from now before the sentencing judge and

21   are saying that he's the leader of the syndicate.  I can't

22   tell you that today but I think what we can safely say is he's

23   right in the middle of it, right in the center of it.  He has

24   multiple calls talking about collection of debt.

25             He's in the middle of this very serious extortion of

1    what we call Victim 1 in our letter.  That's someone who is

2    found by the thieves in Israel and they say we have him in our

3    hands essentially to Gershman.  Victim 1 is extorted through

4    his family in Russia and that just shows the sophistication

5    and the reach of this organization.

6           Now, Tsvetkov is intercepted talking to Gershman and

7    Gershman is asking him what's his debt, I want to report it to

8    the thieves, and they discuss the total debt which is in the

9    tens of thousands of dollars just to Gershman and Tsvetkov.

10          He's also involved in Victim 2's extortion.  He's

11   the one that actually detects that there was cheating going.

12   They suspect cheating at one of the poker games which later

13   leads to Gershman saying -- talking -- calling other persons

14   and saying I need a toy, meaning I need a gun to take care of

15   this.

16          So he's was right in the middle of the syndicate.

17   He is -- we have surveillance.  We have confidential sources

18   that indicate that he's a partner in the legal -- in the

19   illegal gambling part of the syndicate.

20          The other interesting fact is, and we think this is

21   true, that he's the owner of Ace Body Shop.  That's his

22   employment; right?  The confidential -- there's a confidential

23   source who's extorted in this case.  He's extorted for $10,000

24   a month of payments he has to make to a co-conspirator.  That

25   extortion takes place and that exchange of money takes place

1   at Ace Body Shop.  That again shows you that he is right in

2   the middle of the syndicate, that he's a main player.  It

3   also -- well, I'll stop there.

4           Here's another disturbing fact that we got from the

5   wire taps.  As you know, Your Honor, it's somewhat unusual to

6   get evidence of violence over the wire taps.  Usually phones

7   are for people discussing business, discussing money but once

8   in a while they do have some conversations about violence. In

9   this case he calls and he casually tells a co-conspirator I

10  just knocked this guy out.  I put him to sleep outside of the

11  shop.  Just another violent behavior and with a man who has

12  shown that he is violent time and time again beginning --

13  beginning with 2004.

14          So this case is strong.  We have wire tap evidence.

15  We have surveillance.  We have confidential sources.  We have

16  indications that he's violent.  We have indications that he's

17  right in the middle of the syndicate, that he's collecting

18  debt, that he's doing the same thing that he was doing in

19  2004, collecting debt and this is not just a few dollars.

20  There's tens and hundreds of thousands of dollars that he's

21  collecting.

22          I'll going to pass you -- actually you already have

23  this.  This is Exhibit 1.  Back to his picture when he was

24  arrested.

25          Another disturbing fact, and we noticed this is a

1   new tattoo that he has that he didn't have at the time of his

2   first arrest in 2004.  He has these two stars by his left and

3   right shoulder.  We spoke with an expert who doesn't know

4   anything about this case but he's an expert in thieves and in

5   how they operate.  He told us these are stars indicating that

6   he is what is essentially a made man.  You don't just have

7   these stars.  People that have these stars and have contact

8   with thieves and are not themselves a made man or not

9   themselves a thief, they get in trouble for that.  That's

10  incandescence.

11          So at the very least he's holding himself out as a

12  made man in this Russian mafia, and that's very disturbing

13  particularly -- it's particularly disturbing because he didn't

14  have these in his first arrest.  That tells us that either he

15  got these while he was in jail, which is when [inaudible] in

16  this organization, or he got these after he got out of jail.

17  So this narrative that I expect to hear from him that he's a

18  changed person doesn't really square with the evidence.

19          THE COURT:  So these two tattoos are post the first

20  case?

21          MR. SPEKTOR:  They're post arrest in the first case.

22          THE COURT:  Post arrest in the first case.

23          MR. SPEKTOR:  We don't know exactly when he got

24  these.

25          THE COURT:  And he was -- in the first case he was

1   detained?

2          MR. SPEKTOR:  He was detained throughout the whole

3   case.  Bail was denied in that case.

4          So, Your Honor, that's our --

5          THE COURT:  Was it -- in the first case was a bail

6   package presented?

7          MR. SPEKTOR:  It's tough to tell just looking at the

8   entries and it's not -- because it's so much -- it's an older

9   case so I don't have all the documents but it looks like

10  there's an initial appearance.  He was put over for a bail

11  argument and that bail was denied.  I don't know whether he

12  put up a package or whether he was just detained because he's

13  dangerous or what exactly happened.  We do know that he wasn't

14  bailed out.

15         THE COURT:  Do you know, Mr. Cohen?

16         MR. COHEN:  There was no package presented in the

17  first case.  He was detained absent any package being

18  presented.  So let me -- I've taken some notes and let me

19  address --

20         THE COURT:  I don't know that Mr. Spektor is done

21  yet.  I just wanted you to answer that question.

22         MR. COHEN:  I'm sorry.

23         THE COURT:  Are you done?

24         MR. SPEKTOR:  Well, I was just going to say this

25  is -- this is our concern about dangerousness in a nutshell,

14

1   that he doesn't have control of himself.  He is proven to be

2   dangerous.  He is proven that he is -- resumed his very

3   serious conduct that he was doing on the last case and this is

4   not someone that Your Honor should put faith into, not someone

5   who should get the benefit of the doubt because I think the

6   community is in serious danger if he's released, and that's

7   our concern for dangerousness.

8           We do have a concern about flight risk, and

9   obviously a lot of our concerns were assuaged by the

10  substantial package that he has put up and all the sureties

11  that have signed, and I think we would have frankly walked

12  away from this argument if this were a different case but the

13  fact that he has this tenuous deferral of removal out there,

14  that he desperately does not want to be removed to Ukraine,

15  that he has appeared to have obtained this deferred order of

16  removal through fraud, that there is some indication there's a

17  change in circumstances in Ukraine with their -- there's

18  actually a prime minister now who's Jewish.  Obviously we're

19  not experts in what is going on in those countries but it just

20  shows you that there's a very good reason for his -- the

21  asylum or whatever it is to be canceled.

22          So as he stands here today he knows that there's a

23  very good chance that he's going to be removed after this case

24  is over.

25          There's also his asylum or whatever it is that he

1   obtained can be canceled because he -- if he's convicted of a

2   crime of violence he's judged to be a danger to the community

3   that's another reason that he could be deported.

4           THE COURT:  Who's burden is it here?

5           MR. SPEKTOR:  It's our burden, Judge.

6           THE COURT:  He's charged with a crime of violence?

7           MR. SPEKTOR:  He's charged with a crime of violence

8   but it's -- we don't get the benefit of the rebuttal

9   presumption just by mere charge of a crime of violence.

10           THE COURT:  What is the burden, clear and

11   convincing?

12           MR. SPEKTOR:  For dangerousness it's clear and

13   convincing evidence and for flight risk it's preponderance.

14           THE COURT:  You don't have any -- aside from this

15   wire tap, fairly recent wire tap of knocking the guy out, you

16   don't have any evidence in this case of actual physical

17   contact with anyone or anything like that?

18           MR. SPEKTOR:  I think at this point I can't proffer

19   specific evidence.  We -- it's still early in this case.

20   It's -- unlike the other cases this is a wire tap driven case.

21   I can tell you that as recently as last night we started

22   searching the phones that we seized from some of the

23   defendants.  One of the videos -- the first phone that we

24   looked at has a very disturbing video of someone who is

25   bleeding, his face is blown shut.  He's begging for his life

1   and there are people in this video saying you know what, just

2   cut him up.  This man was clearly in fear of being killed.  I

3   can't proffer to you that Tsvetkov was involved in that video.

4   What I can say it's a person who is likely a member of the

5   syndicate and the victim is saying I'm not going to mess with

6   you and your people any more.  That just shows the type of

7   violence that is pervasive within this organization.  But I --

8   to answer your question, aside from just knocking someone out

9   that he casually tells Gershman on the phone, we don't have

10  the same kind of narrative that I can offer you at this point

11  that we had in the other case.

12          In the other case that narrative developed later in

13  the case.  It wasn't -- if you read the detention memo in that

14  case they didn't have all the victims telling their story.  So

15  I think there's clear indication that this organization is

16  involved in violence.  There's certainly an indication that

17  he's particular -- that Tsvetkov in particular is involved in

18  violence, and that is our concern about dangerousness.

19          Just to finish up our point about the risk of his

20  flight, the other thing that he has tattooed on his body is --

21  it appears this is on his right side is a Russian eagle.  Now,

22  Russian --

23          MR. COHEN:  Russian eagle?

24          MR. SPEKTOR:  Yes.  On his right torso

25          THE COURT:  Torso?

1          MR. SPEKTOR:  Or abdomen, yes.  That's concerning to

2    us because this organization has ties to Russia as we've shown

3    in our letter.  He speaks Russian.  Russia doesn't have an

4    extradition treaty with us.  He has the means to go to Russia.

5    Aside from the diamond cross that we seized during the arrest,

6    he also had a very expensive watch.  This is a Breitling -- I

7    can't pronounce it because I haven't worn it but it's a very

8    expensive diamond covered watch that's worth in the thousands

9    of dollars.

10          He's a man who's also collected debt in the tens of

11   thousands of dollars.  He certainly has the means to flee and

12   he has the means to make his family whole if they're put out

13   of money because he doesn't appear in court.  That's really

14   our concern with flight.

15          As I mentioned, we're -- certainly some of our

16   concerns are assuaged by the package but they're still there

17   and we're certainly very concerned about his dangerousness, an

18   that's why, Your Honor, he's not an available candidate.

19          THE COURT:  Okay.  Mr. Cohen.

20          MR. COHEN:  Thank you, Your Honor.  If Mr.

21   Tsvetkov -- withdrawn.  Had I had to appear at a detention

22   hearing in this first case I wouldn't be wasting my breath.

23   The conduct that Mr. Spektor has described took place when Mr.

24   Tsvetkov was about 21 years old.  That's 16 years ago.  The

25   Government indicates that he is in a small subset of made men

18

1  in this international thieves organization.  I did a little

2  research on this and there's actually a written code for this

3  thieves in law organization, and I want to read you the first

4  three items.

5       Number one, forsake his relatives, mother, father,

6  brother, sisters.  Number two, not have a family of his own,

7  no wife, no children.  This doesn't preclude him from having a

8  lover.  Number three, never under any circumstances work no

9  matter how much difficulty this brings.  Live only on means

10 gleaned from thievery.

11      Mr. Tsvetkov in 2004 was essentially homeless.  He

12 had suffered an extremely abusive and traumatic life.  He was

13 a very serious substance abuser and he was a dangerous guy.

14 I'm not going to say that the Government's not right in saying

15 that many years ago he shouldn't have been let out.  He hasn't

16 forsaken his family.  In fact, since his release from prison

17 he's married and he has two children.  One is two years old.

18 One is a month old.  That covers actually the first two points

19 of forsaking his family and not having a family of his own,

20 wife, children.

21      Number three, never under any circumstances work no

22 matter how much difficulty this brings.  Mr. Tsvetkov has

23 opened an auto body shop.  He does work for insurance

24 companies.  He does restoration of vehicles, and certainly the

25 fact that he has some tattoos are not indicative of who he is.

1   I -- this is the first -- I actually have a dragon tattooed on

2   my right arm.  Does that mean I'm a member of Chinese

3   organized crime?  If I had to do it over again I wouldn't get

4   that tattoo and I'm guessing that if Mr. Tsvetkov had it to do

5   over again he wouldn't have the tattoos that he has.  But a

6   tattoo is kind of a gift that keeps on giving.  I mean once

7   it's there it's not going any place.  It's very, very

8   expensive and very, very painful to have a tattoo removed.  We

9   don't know when he got them.  They may reflect who he was

10  then.  They do not reflect who he is now.

11          With respect to this indictment being identical to

12  the other one, his conduct in the other indictment was

13  entirely different and the conduct of the people with whom he

14  was involved was entirely different.  It was far more palpably

15  violent in which he played a role.

16          The Government seeks to tarnish Mr. Tsvetkov with

17  the fact that 16 years ago he possessed a machete and a couple

18  of months ago a co-defendant possessed a machete.  That is an

19  unreasonable inference to draw that because he had something

20  16 years ago and somebody that he talks to or is a co-

21  defendant has one now that that means that he's the guy who

22  would be wielding that machete, possessing or using it.

23  There's no allegation that he used it.

24          This incident with this guy being beaten with a

25  board again, it's not him.  He's not involved with that.

1    When Judge Garaufis sentenced him to 78 months he

2  actually during the sentencing stopped the proceeding and went

3  to lunch and came back and spoke to Mr. Tsvetkov about his

4  attitude.  It seemed to him that his attitude was very casual

5  and shrug and he said he had nothing to say, and this

6  disturbed Judge Garaufis.  Ultimately Mr. Tsvetkov did and

7  again as Judge Garaufis said, you can't really read a shrug or

8  an attitude from the cold record.  He evidently did make

9  apologies for his conduct and Judge Garaufis was persuaded

10  that he was redeemable.  I think Judge Garaufis has been

11  proved right.

12    I don't know if the fact that he has some sort of

13  cross tattoo or was in possession a cross is meant to suggest

14  that he's not actually Jewish.  He is entirely involved in the

15  Jewish community.  He volunteers at a --

16    [Pause in proceedings.]

17  MR. COHEN:  He's in [inaudible] in the Jewish

18  community.  Although Ukraine does have a Jewish president,

19  it's had a greater migration from it by Jews year by year for

20  the last four years because not only of the war because

21  there's been a substantial increase in anti-Semitism in

22  Ukraine.  He certainly has no desire as evidenced by the fact

23  that he spent 17 months in immigration custody to go back

24  there.  The Government says that his entire deferred removal

25  was based on a fraudulent affidavit, a hearsay affidavit from

1   a co-defendant.  Immigration looked at this case very, very

2   carefully.  Ultimately it went to a four judge panel that

3   agreed that under the convention against torture that he

4   should not be removed to Ukraine.  I'm sure, although I don't

5   have it in front of me, I'm sure that it was more than a

6   hearsay affidavit by a racketeer that there's anti-Semitism in

7   Ukraine.

8          The fact that he was intercepted talking to three

9   different people indicates to me that he was not an original

10  target in this case.  That his phone was not one that was the

11  subject of a Title 3.  He certainly could have chosen his

12  friends better.  He certainly could have gambled less.  He

13  could have been more careful about who he spoke to on the

14  phone but there's nothing in these calls to indicate that he's

15  the kind of guy that he was when he was 21 years old.  He's a

16  much more mature man.  He's 37.  He has things in his sight

17  that he had never before that mean a great deal to him and I

18  think is evidenced by the show of support that he had

19  yesterday and today where a lot of people in his community

20  that believe in him, that believe -- that were surprised and

21  shocked that he was charged with this conduct and who are

22  willing to put themselves at very substantial risk financially

23  to assure his release and I think that speaks not only to risk

24  of flight but also to how he's perceived by people and whether

25  or not the people closest to him believe that he's a dangerous

1   person.  He's a loving father.

2          The incident that occurred where he talks to someone

3   on the phone about smacking somebody down is an incident that

4   involved the police department in that a guy who's a heroine

5   addict came to Mr. Tsvetkov's shop with a vehicle that had

6   been in an accident.  He wasn't the owner of the vehicle.  He

7   wanted Mr. Tsvetkov to do the insurance work.  Mr. Tsvetkov

8   repeatedly told him you have to bring the authorization from

9   the owner, I need paperwork from the insurance company, and

10  this went on for a week or two.  Mr. Tsvetkov had to dismantle

11  the car to give an estimate to the appraiser and the guy

12  essentially came back about a week later and said you know

13  what, don't even report it, let's just fix the car.  I'll give

14  you $2,000 and I'll keep the rest.

15         Mr. Tsvetkov got very upset that he was being set

16  up.  Excuse me.

17                    [Pause in proceedings.]

18         MR. COHEN:  Mr. Tsvetkov wouldn't bill him and

19  wouldn't return the car to him.  The next day the guy came

20  back and tried to steal the car.  He got into the car which

21  had not only its own keys in it but keys from other vehicles

22  that Mr. Tsvetkov was working on and tried to steal it, tried

23  to drive out of the body shop with it.  He got stopped.  Mr.

24  Tsvetkov lost his temper.  This was not something that he does

25  on any sort of regular basis.  It's an isolated incident in

1  which he was essentially being victimized, and if he's this

2  big tough made man in the thieves at law I don't think people

3  in his neighborhood are going to be messing with him.  So Mr.

4  Tsvetkov loses his temper, smacks the guy around and calls the

5  police.  I have the names of the detectives that he spoke to.

6  I don't know if the guy was ever arrested but the vehicle was

7  seized.  And a police report was made.

8  　　　　So view that incident in a vacuum it seems like

9  maybe he stole a dangerous guy -- when you see it in the

10  context of how it happened that is far from the case.  He was

11  business guy doing business in a business where he has a

12  partner who's a legitimate guy, has no ties to any criminal

13  activity.  They've worked to build this business up and here

14  comes this young fellow who puts everything at risk and tries

15  to steal the car with not only its own keys but the keys for

16  other vehicles that Mr. Tsvetkov was working on.

17  　　　　The fact that some gambling debts were paid at his

18  place of business don't indicate that he participated in any

19  violence or that he collected the debt.  It's a place that

20  people come.  Maybe some of the people that go there aren't

21  such good people but that doesn't speak to whether Mr.

22  Tsvetkov today as he stands here is a danger to the community.

23  　　　　　　　　[Pause in proceedings.]

24  　　　　MR. COHEN:  Another aspect of this thief in law code

25  is that you never go to the police.  You never cooperate with

1  the Government.  You never seek legal authorities to redress

2  your grievances.  I think the fact that he did call the police

3  and got detectives involved in this is another indication that

4  he's not the made man that the Government says that he is.

5                    [Pause in proceedings.]

6           MR. COHEN:  Now, I don't know, Judge, if I've

7  addressed every single point that the Government made but I

8  think essentially their argument is he was a viscous guy 16

9  years ago, he did terrible things.  Granted.  His association

10  here I think arguably is mere association.  There's no

11  indication that he possessed any weapons, that he uses

12  narcotics.  He lives a drug free life.  He doesn't even drink.

13           And the last thing he wants to do in terms of risk

14  of flight is to go back to any part of the former Soviet Union

15  whether it's Russia, Ukraine or any place else.

16           If having those tattoos not being a made man gives

17  you a death sentence, Russia is the last place he wants to go.

18           MR. SPEKTOR:  Your Honor, I think the overall

19  narrative that we hear is that he's this changed person since

20  he's been released from prison.  It just doesn't square with

21  the evidence.  I  don't want to stand here today and say that

22  we can prove beyond a reasonable doubt that he's a made man.

23  All we're saying is that these tattoos which are very unique,

24  they're eight sided tattoos, something that you do when you

25  want to hold yourself out to be as part of a Russian mafia.

1    Why would you do that if you're this changed person who has a

2    legitimate job, has a loving family.  That makes absolutely no

3    sense, and the fact that these tattoos are recent that's

4    concerning. That's al we're saying about the tattoos.  We're

5    certainly not putting all of our eggs in that basket.

6              The other thing Mr. Cohen just said is that he has

7    some bad friends, he's not really a part of this violent

8    collection of debt.  There are a number of calls where it

9    shows that he's right in the middle of it and I just want to

10   quote one.  This is Tsvetkov talking to Gershman who's the

11   lead defendant.  This is Gershman saying to Tsvetkov.  "I just

12   wanted to -- I was in the line with the thieves, wanted to

13   make sure that the discount that we gave him," him being

14   Victim 1 who's living in Israel, "that it stayed.  The

15   discount we gave him that it stayed."

16             THE DEFENDANT:  Stayed, that's their wording?

17             MR. SPEKTOR:  Yes, stayed.

18             "Already whatever, already we already asked kind of

19   to make the right steps and not complicate the situation while

20   they're holding him in their hands."

21             So the thieves found this victim in Israel after

22   extorting his family in Russia and now Gershman is consulting

23   with what appears to be his right hand man and saying I want

24   to make sure that -- I want to make sure that I have it right

25   and I talked to the thieves and what the discount is that we

1   gave him.  What they come to is a debt that's in the tens and

2   hundreds of thousands of dollars that this victim owed

3   Gershman/Tsvetkov.

4           The incident about knocking someone out.  Again, I

5   think you have to -- when you hear these excuses one after

6   another I think at some point you have to look really -- you

7   have to really suspend your disbelief.

8           The way he deals with confrontation it appears from

9   what Mr. Cohen is saying, is that he is still very violent.

10  We don't have this whole narrative over the wire tap about

11  this is a heroin dealer who shows up and steals a car.  All he

12  says in the wire tap is that guy, and he says the name of the

13  guy indicating that he knew who it was, he came over and I

14  knocked him out.  That's all that's on the wire tap.

15          I don't know if what Mr. Cohen is getting from his

16  client is necessarily true.  It doesn't completely square with

17  the wire tap evidence.  All it shows here is that when he's

18  confronted he lashes out violently and that's why we have

19  serious concerns about his dangerousness.

20          This syndicate is clearly dangerous.  He's part of

21  the syndicate.  The syndicate is violent when it collects

22  debt.  We just saw a video last night of how violent it can

23  be.  He's part of it and that makes him a danger to the

24  community and that's really the force of our argument.

25          Then just going to the body shop, that's the place

1    where extortion took place, not just someone collecting some

2    gambling debt.  This is -- and we proffered this evidence and

3    this is on Page 5 of our detention memo about the extortion of

4    CS 1 where he's made to pay protection money and then the co-

5    conspirator tries to get another person who turns out to be a

6    confidential source to hurt this person so that this person

7    turns to the syndicate for protection.  This is very serious

8    conduct.  The $10,000 that's paid is paid at the body shop

9    where he's the owner, where he admits he's doing it.

10          This is why he's dangerous.  He's part of a

11   dangerous syndicate and he has acted out violently which is

12   just the very same conduct that he's engaged in in 2004, and

13   that's our concern, Your Honor.

14          MR. COHEN:  Just very briefly.  Judge, the tattoos,

15   take a look at Mr. Tsvetkov's stature.  Federal prisons are

16   hard places to survive in and given his stature he could

17   easily be a victim prone individual.  He got the tattoos in

18   jail many, many years ago and were I him I also might have

19   tried to hold myself out as a tough guy because that's what

20   you do in prison.  That's how you survive.

21          Everything, just about everything that he's done

22   since his release have proven that he has violated every

23   aspect of the thieves code which could cause his death.

24          The conversation with Gershman that was just alluded

25   to it sounded to me like most of the talking was done by

1   Gershman.  I don't think that a working guy -- by the way, he

2   volunteers at two different agencies or establishments in the

3   community.  Teachers tennis one day a week so that his young

4   son can have the benefit of participating in a toddler's

5   gymnastics program and he volunteers --

6                      [Pause in proceedings.]

7           MR. COHEN:  -- at a painting class for toddlers.  A

8   guy that is gainfully employed, has employees, brings home a

9   paycheck every week with taxes paid and taken out is not a guy

10  who has the time, much less the inclination, to be the right

11  hand man of the top person in this indictment.

12          The video that Mr. Spektor alluded to of somebody

13  being beaten it's not Mr. Tsvetkov who's doing it and it's not

14  Mr. Tsvetkov's phone that the video is recovered from.  Can

15  they prove association with these people?  Yes.  Can they

16  prove that either for the benefit of this Court or at trial

17  that Mr. Tsvetkov is now a dangerous individual who did

18  violent things?  I don't think so, Judge.

19          Thank you.

20          THE COURT:  Anything else?

21          MR. COHEN:  Oh, one other thing.  The Government

22  says that various debts were paid at the body shop.  They

23  don't say they were paid to Mr. Tsvetkov.

24          THE COURT:  I think the case law from the Second

25  Circuit is very clear that someone can be a danger to the

1  community without actually doing the violence themselves
2  particularly in the area of organized crime and that there
3  really are very few, if any, conditions of release that can
4  guard against the safety of the community in such situations.

5        This is a troubling case.  There are -- have been
6  reasons put forth by Mr. Cohen that in first consideration
7  seem to go against what the Government is saying.  But I think
8  the Government has sustained its burden here to prove by clear
9  and convincing evidence that Mr. Tsvetkov is a danger to the
10  community.

11        As Mr. Cohen said, granted he was a -- I think the
12  words are vicious guy 16 years ago and while there may have
13  been some changes in his behavior the example of what occurred
14  in the body shop with this purported heroin dealer --

15        MR. SPEKTOR:  I'm sorry.  I saw he was a known
16  addict, not a heroin dealer.

17        THE COURT:  I'm sorry, heroin addict.  I don't want
18  you to slander [inaudible], is indicative that Mr. Tsvetkov is
19  still a danger to the community.  When presented with a
20  troubling situation the resort was to violence.  It sort of
21  fits him that the Government's picture of extortion and what
22  happens when people get extorted and they don't pay, they get
23  beat.

24        So I'm going to deny the bail application.  We will
25  detain Mr. Tsvetkov until trial.

1          MR. COHEN:  Judge, I'm going to appeal Your Honor's

2   ruling to Judge Cogan.  I think that in order to do that we

3   need to have a transcript prepared of this proceeding.

4          THE COURT:  Judge Cogan?

5          MR. SPEKTOR:  It was reassigned to Judge Cogan after

6   it was initially assigned to Judge Irizarry.

7          THE COURT:  Okay.  We'll have the transcript

8   produced.

9          MR. COHEN:  Do you have any idea how long that would

10  take, Judge?

11         THE CLERK:  You can have it turned over in 24 hours.

12  Just go downstairs to the clerk's office and give them the

13  times.  You may want the times from yesterday and the times

14  from today.

15         THE COURT:  We'll note for the record and for Judge

16  Cogan's consideration that we already have the signatures of

17  the nine sureties and -- but for the issue of dangerousness I

18  think this bond would be sufficient except I would add

19  electronic monitoring.  And also the -- it probably be more

20  specific in Paragraph 2 about avoiding contact with specific

21  persons.  It would be clearly the co-defendants in the case

22  except in the presence of counsel and any known or suspected

23  members of --

24         MR. SPEKTOR:  We call it the syndicate.

25         THE COURT:  -- the syndicate.  So if Judge Cogan

1   disagrees with me about dangerousness then he'll have a bond

2   that I think is sufficient other than that.

3           MR. SPEKTOR:  Would you recommend home detention as

4   well, Judge?

5           THE COURT:  Mr. Tsvetkov should be permitted out to

6   work I would think.

7           MR. COHEN:  That would be very important, Judge.  He

8   has two young children.  His wife is taking care of the kids

9   and he's the only source of income for her and the kids.

10          THE COURT:  Let me add this to the bond so it's

11  clear.

12                      [Pause in proceedings.]

13          THE COURT:  Home detention except for attorney

14  visits, court appearances, medical treatment, religious

15  services, employment.

16                      [Pause in proceedings.]

17          THE COURT:  Since we want to make this easy on Judge

18  Cogan, any other conditions that you recommend or Pretrial

19  Services?

20          PRETRIAL:  Do you [inaudible] substance abuse?

21          THE COURT:  I think that's -- no, no, it's not.

22          MR. SPEKTOR:  No objection to testing but if

23  treatment is not indicated then it's not indicated.

24          MR. COHEN:  Judge, with respect to the condition

25  that the Government has requested about avoiding association

32

1  with suspected members of the syndicate, I think in all

2  fairness that we need to have a list of people from the

3  Government as to who they suspect of being members of the

4  syndicate so that some incidental conduct that he may have in

5  his synagogue or his place of employment doesn't wind up being

6  a violation of his bail conditions.

7          THE COURT:  Can you provide a no contact list?

8          MR. SPEKTOR:  We're weary of doing that at this

9  stage.  I think we could start with the co-defendants as well

10  as the co-defendants and I don't have the case number in front

11  of me but the two defendants who were arraigned on the same

12  day, Seamon Condos and Patalnikov [Phs.].

13          THE COURT:  So you want to take out -- I have

14  written no contact with co-defendants except in the presence

15  of counsel or known or suspected members of syndicate.  Do you

16  want me to take that out or -- it would be the Government's

17  burden to prove that a contact was with someone who was known

18  or suspected and to prove that Mr. Tsvetkov knew that or

19  suspected that.  I mean that's a pretty difficult burden.

20          MR. COHEN:  For that reason, Judge, and in order to

21  avoid further proceedings, in the event that Judge Cogan finds

22  him not to be a danger I think that should either be removed

23  about suspected members of the syndicate or the Government

24  should provide us with who they're talking about.

25          MR. SPEKTOR:  I think we can say known members.

1    It's going to be our burden like Your Honor said to prove that

2    they were known.

3              THE COURT:  Or known, okay.  I'll take out

4    suspected.  Or known members of syndicate.

5              Let me just look at the Pretrial Services Report one

6    more time.

7                        [Pause in proceedings.]

8              THE COURT:  So I'll just read into the record so

9    Judge Cogan has it.  $1 million bond secured by the two

10   properties, Batchelder Street and Royce Street, nine sureties,

11   travel restrictions to New York City and Long Island.  No

12   contact with co-defendants except in the presence of counsel

13   or known members of the syndicate.  No applications for

14   passports.  Pretrial Services supervision subject to random

15   home and workplace visits and reporting by telephone as

16   directed or in person.

17             Must undergo testing, evaluation and treatment for

18   substance abuse including alcoholism as directed by Pretrial

19   Services, electronic monitoring, and he will be restricted on

20   home detention with -- restricted to the home at all times

21   with -- except for attorneys visits, court appearances,

22   medical treatment, religious services or employment, and he

23   must pay for the cost of any testing, evaluation or treatment

24   and location monitoring.

25             That's the bond.  That would be acceptable to me if

34

1    Judge Cogan reverses the dangerousness finding.

2            MR. COHEN:  Just two minor things, Judge.

3            THE COURT:  Yes.

4            MR. COHEN:  One is that certainly no objection to

5    testing for substances and alcohol but treatment only if

6    warranted as opposed to testing and treatment.

7            THE COURT:  That's what Pretrial Services does.  If

8    there are no negative -- if there are no positive tests

9    they're not going to order treatment.

10           MR. COHEN:  Okay.  And also I don't know how much it

11   costs to pay for this monitoring but he has assigned counsel.

12   Although he does operate a business it would probably be

13   something of a hardship to --

14           THE COURT:  What is the EM cost per day?  Do we

15   know?

16           PRETRIAL:  I can't remember.  I'm drawing a blank.

17           THE COURT:  All right.  Since there is assigned

18   counsel I will take that off the bond.  Any objection?

19           MR. SPEKTOR:  No, Your Honor, although I will note

20   that the items that were seized from Tsvetkov certainly

21   indicate that he has the means to pay for this electronic

22   monitoring but I don't think we had to pick a fight with this.

23           THE COURT:  All right.  Let me finish the order of

24   detention.

25                     [Pause in proceedings.]

35

1          THE COURT:  You might want to contact Judge Cogan to

2   set up dates for a hearing.  We're going to put these in the

3   record as exhibits?

4          MR. SPEKTOR:  Yes, Your Honor.

5          THE COURT:  A picture of Mr. Tsvetkov is Exhibit 1

6   and the cross is Exhibit 2?

7          MR. SPEKTOR:  Correct, Your Honor.

8              (Government's Exhibit 1, Received.)

9              (Government's Exhibit 2, Received.)

10         MR. COHEN:  Is there anything else?

11         MR. SPEKTOR:  Not from the Government.

12         THE COURT:  Thank you.

13   (Proceedings concluded at 12:23 p.m.)

14                          *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

36

1        I certify that the foregoing is a court transcript from

2   an electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                          _____

6                              Shari Riemer, CET-805

7   Dated:  November 20, 2016